# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO.  03-22-00705-CV

**N. N. and Texas Department of Family and Protective Services, Appellants**

**v.**

**C. P. and J. N., Appellees**

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-19-008360, THE HONORABLE CLEVE WESTON DOTY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The Department of Family and Protective Services sued to terminate the rights of

C.P. (Mother) and J.N. (Father) to their child, N.N.  Although the trial court found after a bench

trial that the Department had proved several predicate grounds for termination of the parents'

rights, the court found that the Department had failed to prove by clear and convincing evidence

that terminating their rights was in N.N.'s best interest.  *See* Tex. Fam. Code § 161.001(b)(2).  The

appellate attorney ad litem for N.N. filed a notice of appeal and appellant's brief on her behalf.[1]

---

[1] We assume for all purposes that N.N. may maintain this appeal in her own capacity
without need of a guardian or next friend to maintain the appeal on her behalf.  *Cf. J.M. v. Texas
Dep't of Fam. & Protective Servs.*, No. 03-22-00435-CV, 2023 WL 213928, at *3 (Tex. App.—
Austin Jan. 17, 2023, pet. denied) (mem. op.) ("Minors are considered to be under a legal disability
and are therefore 'unable to sue or be sued in their individual capacities; they are required to appear
in court through a legal guardian, a "next friend," or a guardian ad litem.'" (quoting *Austin Nursing
Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005))).  Her appellant's brief specifies that her
guardian ad litem is "not a party to the appeal."  Nevertheless, no party challenges in this Court
N.N.'s capacity to maintain this appeal, so we need not address the issue.  *See Coastal Liquids*

The brief's two appellate issues are that (1) the evidence was legally and factually insufficient to support the trial court's findings against the Department on "best interest" for terminating parental rights, and (2) the court abused its discretion by appointing the parents as possessory conservators. Because the evidence was factually insufficient (but otherwise legally sufficient) for the trial court to find against the Department on "best interest" for terminating parental rights, and because N.N. argues that we need not reach her second appellate issue if we sustain her first, we reverse and remand for a new trial without addressing the second issue.

## FACTUAL AND PROCEDURAL BACKGROUND

At the time of trial in 2022, N.N. was almost five years old. About two and a half years earlier, the Department initiated this suit based on two referrals for neglectful supervision. The first referral involved domestic violence committed by Father against Mother. He was jailed, and Mother testified that she would soon seek a divorce. The second referral occurred just a day or two after Father's domestic violence and involved N.N. and her two half-siblings by Mother and another man, K.L. and E.L. An unrelated person noticed the three children alone in a car together and called police. Officers arrived to find that Mother had emerged from a nearby house. The officers smelled marijuana in the car and found black-tar heroin in Mother's possession, which Mother said she had grabbed from the house. Mother was jailed for possession of a controlled substance and child endangerment.

During this suit, N.N. was placed variously with her half-siblings' paternal grandmother, in a short-lived foster placement, in a return-and-monitor placement with Mother

*Transp., L.P. v. Harris Cnty. Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001) (defects in capacity can be waived).

2

and Father, with Mother's mother, with the half-siblings' paternal grandmother again, in a second return-and-monitor, and finally in a longer-term foster placement, where they stayed through trial.

Mother and Father, by their own admission, are drug addicts and struggle to stay sober. Mother relapsed several times during this suit and went to drug rehabilitation or detoxification facilities on at least five separate occasions. Mother admitted to a long history of drug abuse, including long-term use of methamphetamine and heroin, abusing Xanax, and sporadic use of cocaine. Mother last used illegal drugs the month before trial, using heroin, methamphetamine, and crack cocaine. Also during the suit, Father relapsed after having enjoyed many years of sobriety.

The suit proceeded to trial jointly on the Department's petition to terminate Mother's and Father's parental rights to N.N. and on the Department's request to terminate Mother's parental rights to her other children, K.L. and E.L., and also the parental rights of their father, S.L. Approximately 22 witnesses testified at trial.[2] Afterward, the trial court found by clear and convincing evidence that Mother had committed violations of Subsections (D), (E), and (P), respectively: (1) she knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children, (2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children, and (3) she used a controlled

---

[2] Witnesses included: Mother's "Outreach Screening Assessment and Referral" (OSAR) counselor, a Department investigator, the children's guardian ad litem, Father's two adult children, S.L.'s mother, a licensed psychologist, Mother, an officer who responded to the incident when the children were in the car and Mother had heroin, Father, a Department conservatorship caseworker, the children's therapist, one of the longer term foster parents, three of Mother's friends, Mother's sister, Mother's mother, Father's domestic violence counselor, Father's psychological evaluator, one of Father's friends, and a Department adoption caseworker.

substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance-abuse treatment program or after completion of a court-ordered substance-abuse treatment program continued to abuse a controlled substance. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (P). The court also found by clear and convincing evidence that Father had violated Subsections (D) and (E). However, the court found that the Department had failed to prove by clear and convincing evidence that terminating either Mother's or Father's parental rights was in N.N.'s best interest.

Although Mother filed a notice of appeal of her own, she later moved to dismiss her appeal, and we "dismiss[ed] the appeal as to" her. *N.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00705-CV, 2023 WL 114878, at *1 (Tex. App.—Austin Jan. 6, 2023, order). The appellate attorney ad litem filed an appellant's brief for N.N., and the Department filed a brief adopting the appellate attorney ad litem's positions and arguments as the Department's own. Mother and Father filed briefs supporting the trial court's findings contrary to the Department's position.

**TERMINATION OF PARENTAL RIGHTS**

To terminate parental rights, the Department must prove at least one of the statutory predicate grounds and, in addition, that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements by clear and convincing evidence. *See* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or

conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

Legal-sufficiency review of the evidence regarding termination requires reviewing all the evidence in the light most favorable to the finding under attack and considering undisputed contrary evidence to decide whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* When reviewing the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

While parental rights are of constitutional magnitude, they are not absolute. *C.H.*, 89 S.W.3d at 26; *L.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00635-CV, 2022 WL 1694474, at *11 (Tex. App.—Austin May 27, 2022, no pet.) (mem. op.). "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *L.M.*, 2022 WL 1694474, at *11. "The strong presumption that a child's best interest is served by keeping the child with his or her biological parents disappears when confronted with evidence to the contrary." *Aguilar v. Foy*, No. 03-10-00678-CV, 2012 WL 677497, at *8 (Tex. App.—Austin Mar. 1, 2012, no pet.) (mem. op.); *accord*

5

*In re T.D.S.*, No. 13-15-00107-CV, 2015 WL 5110472, at \*21 (Tex. App.—Corpus Christi-Edinburg Aug. 28, 2015, no pet.) (mem. op.); *B.B. v. Texas Dep't of Fam. & Protective Servs.*, 445 S.W.3d 832, 838 (Tex. App.—El Paso 2014, no pet.); In re C.M.C., No. 14-12-00186-CV, 2012 WL 3871359, at \*5 (Tex. App.—Houston [14th Dist.] Aug. 30, 2012, pet. denied) (mem. op.); *In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.).

This appeal involves legal- and factual-sufficiency attacks on the evidence supporting findings the court made that were contrary to the position of the party who bore the burden of proof. *See M.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00163-CV, 2022 WL 4281617, at \*7 (Tex. App.—Austin Sept. 16, 2022, pet. filed) (mem. op.). For the appellants to succeed on legal sufficiency, therefore, they "must demonstrate . . . that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Id.* (internal quotation omitted) (quoting *In re Q.M.*, No. 02-19-00367-CV, 2020 WL 827595, at \*2 (Tex. App.—Fort Worth Feb. 20, 2020, no pet.) (mem. op.)). We may sustain such a legal-sufficiency challenge "only if as a matter of law, the evidence conclusively establishes the 'contrary proposition' to the finding" under attack, *id.* (quoting *Q.M.*, 2020 WL 827595, at \*2), which here means that the evidence must have conclusively established that terminating Mother's or Father's parental rights was in N.N.'s best interest, *see* Tex. Fam. Code § 161.001(b)(2); *M.P.*, 2022 WL 4281617, at \*7. For factual sufficiency in this context, "we review the entire record and determine whether the trial court's failure to form a firm conviction or belief that a parent's rights must be terminated is 'contrary to the overwhelming weight of the evidence and clearly wrong.'" *M.P.*, 2022 WL 4281617, at \*7 (quoting *Q.M.*, 2020 WL 827595, at \*2).

When reviewing for the best interest of a child, factors that courts consider include (1) the child's wishes, (2) the child's emotional and physical needs now and in the future,

(3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the existing parent–child relationship is improper, and (9) any excuses for the parent's conduct. *Id.* (citing *A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). This list of factors is not exhaustive, not all of them need to be proven to determine a child's best interest, and analysis of a single factor may be adequate in a particular factual context. *Id.* (citing *C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 372).

In the first issue, the contention is that the evidence was legally and factually insufficient to support the trial court's failure to find that termination was in N.N.'s best interest.

### *Best interest concerning Father*

The evidence in Father's favor, which we conclude was more than a scintilla, means that the Department did not conclusively establish that terminating his parental rights was in N.N.'s best interest. *See id.* But we also conclude that the trial court's finding in Father's favor against the Department's position was contrary to the overwhelming weight of the evidence and clearly wrong and was therefore factually insufficient. *See id.* We review the evidence through the prism of the *Holley* factors.

The evidence of N.N.'s wishes—the first factor—points in favor of terminating Father's parental rights. The conservatorship caseworker testified that N.N., as well as her half-siblings K.L., and E.L., want to stay with the foster parents. Other testimony showed that at least the half-siblings are angry with Mother. Some of that anger, according to the testimony,

7

related to statements by one of the half-siblings that he does not feel safe in the home with Mother and Father.

The evidence under the second, third, seventh, eighth, and ninth *Holley* factors, although somewhat rebutted, overwhelmingly points to termination. Within the evidence, Father's drug abuse and his misbehavior inside and outside the home were main themes.

First, the drug abuse. *See J.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00583-CV, 2023 WL 2169492, at *6 (Tex. App.—Austin Feb. 23, 2023, no pet.) (mem. op.) (holding that evidence was sufficient to support best-interest termination finding in part because parents used illegal drugs and "continued to test positive for methamphetamine when they knew their parental rights were in jeopardy" despite their having undergone intensive drug therapy, which supported conclusion "that drug treatment programs are ineffective for them"). Father has by his own admission used heroin, crack cocaine, and methamphetamine over the years. And he used those drugs mostly daily for a period of about a year during this suit. The month before trial, he had to be hospitalized because of withdrawal symptoms. He admitted to having lied under oath earlier during the suit about whether he was maintaining sobriety. He admitted to being a "pothead" at 10 or 11 years old and to trying "every drug" before the age of about 17 years. He has been to 11 different drug-rehabilitation facilities throughout his life. He admitted to enabling Mother's drug use and to bringing drugs into the home so that she and he could use even though the children were there. While he lived with Mother during this suit, their home had liquor and drug paraphernalia in cabinets within the children's reach, which worried S.L.'s mother because, she testified, E.L. "goes through everything." Father was only about 19 days sober by the time of trial. Specifically during the first return-and-monitor, the children's behavior was growing increasingly erratic, and Father and Mother tested positive for methamphetamine and

8

amphetamine. As this suit went on, Father eventually began refusing Department-directed drug tests. Then during the second return-and-monitor, Father had lost a lot of weight, and the children grew uncontrollable.

Father's drug abuse also affected his relationships. They affected his relationships with his two adult daughters, C.E., who was nearly 31 years old at the time of trial, and T.N., who was nearly 19 years old at the time of trial. Both voluntarily testified in the Department's favor to try to protect N.N. C.E. testified that she had no relationship with Father during her childhood. Her grandparents wanted to keep her away from Father's drug abuse. Similarly, T.N. testified that she had no relationship with Father for most of her childhood. She declined to visit with him once it was her choice about whether to do so. Once C.E. developed a relationship with Father as an adult, there was one instance when he was with both daughters and asked C.E. to go somewhere else so he could smoke marijuana. T.N. related other incidents, the first from when she was four years old: "I was in a car accident because my dad was on drugs. I would frequently visit shady places, drug places with a bunch of random people. I would be in cars by myself for a good minute. . . . [I]t affected my childhood a lot, I would say." The psychologist testified that children who are exposed to drug use can develop problems with self-esteem and self-confidence, have increased difficulty with forming relationships, and have a higher chance of developing mental-health issues. Father's drug use has affected Mother, who, one of her friends testified, will improve her prospects for staying sober once she separates from Father. And his drug use affected other relationships, as he admitted when he testified: "I have single-handedly destroyed three families . . . . I have lost everything. I have bulldozed everybody within 10 miles of me away that has ever—that has ever loved me. I pushed everybody away."

9

Other evidence, however, was in Father's favor about his attempts to turn away from his drug addiction. He had enjoyed roughly 10 straight years of sobriety before his relapses in 2021 and 2022, including participating in recovery groups and maintaining sobriety when N.N. was born and during the first return-and-monitor. Mother had no concerns with Father's parenting leading up to this suit. His OSAR counselor recommended merely detoxification because Father "had a foundation" in the system, which should increase his likelihood of future sober living. The return-and-monitors could happen at all because Father was providing clean drug tests and completing Department-directed services.

Next among the relevant topics in the evidence under these *Holley* factors was Father's other misbehavior inside and outside the home. *See D.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00455-CV, 2022 WL 91972, at *8 (Tex. App.—Austin Jan. 6, 2022, pet. denied) (mem. op.) (holding that evidence was sufficient to support "best interest" termination finding in part because of parent's "inappropriate behavior" and lack of improvement in "parenting abilities and stability"); *E.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *8 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) ("'A child's need for permanence through the establishment of a stable permanent home' is 'the paramount consideration in a best-interest determination." (quoting *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied))); *In re E.M.*, 494 S.W.3d 209, 226 (Tex. App.—Waco 2015, pet. denied) ("The goal of establishing a stable permanent home for a child is a compelling state interest. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs." (internal citation omitted)). This suit began soon after Father was jailed for domestic violence against Mother. Father told C.E. that he had "beat" Mother, which included putting his hands on her and taking a phone from her when,

10

unbeknownst to him, she was on the phone with police. A protective order was in place for a time to keep Father away from Mother and the children, and Mother asked the Department for information on domestic-violence shelters. Mother's mother testified that Father has been abusive also by banging on doors and pushing Mother into a wall. Half-siblings K.L. and E.L. have heard "cussing and yelling" between Father and Mother. T.N. has heard verbal abuse between them too. Other witnesses described their relationship as turbulent, and Mother admits that there is codependency between them. T.N. specifically wanted to testify to report on what she saw as a bad pattern with Father and Mother, so much so that she did not want the children with them even if the parents' rights were not terminated, and that the children have enjoyed a much better turn-around with the foster parents. There was testimony about an instance when N.N. cried because Father had swatted her on her back. And the guardian ad litem related a concern that during the second return-and-monitor, the children were not being given their prescribed mental-health medication often enough. But the home itself was in a terrible condition during the second return-and-monitor. The guardian ad litem found it to be significantly messy, with animal feces in some of the children's bedding, cigarette butts on the floors, and the noticeable stench of both pervasive. T.N. also noticed that the home lacked electricity. She has had to give the parents money to pay bills even though she was just 18 years old. S.L.'s mother has given them money too, and Father and Mother have had to pawn items, including her engagement ring, to buy drugs. Father and Mother once stayed in the home while S.L.'s mother was the children's placement even though the Department had directed them not to because they had nowhere else to stay.

Mother gave testimony about Father's doing most of the work around the house and said that that was an expression of his overall pattern of narcissism and controlling and manipulating behavior. Father admitted that he has control issues. Mother's sister believes that

11

Father is possessive and added: "[H]e was more addicted to my sister than [to] his own sobriety, his own life, and his own children. And that is, to me, disgraceful." Mother said that Father tried to separate her from her family and through his negativity both made it difficult for her to coparent with S.L. and drove her to consider suicide. He would often rifle through her belongings. She believes him to be controlling, jealous, and disrespectful of women. His psychological evaluator corroborated his controlling nature and diagnosed him with major depressive disorder and adjustment disorder. T.N. believes both Mother and Father to be emotionally manipulative, getting people to lie for them. A friend of Mother's agrees, testifying that Father is manipulative and "wears a mask." S.L.'s mother believes that Father has acted threateningly toward her. And Father and Mother both were once verbally abusive toward K.L., causing the child to cry.

Next, the Department specifically included in the parents' Family Safety Plan that they needed to provide adequate food for the children and not physically punish them because one of the sons had complained about those items. K.L. and E.L.'s therapist is treating them for trauma and emotional dysregulation, among other things, and they have expressed that the home with Father and Mother was chaotic and that they did not trust the parents to provide a safe space. Specifically regarding N.N., a caseworker had asked Father and Mother for a long time to schedule a dental appointment for N.N. because her teeth hurt a lot. The parents never acted. Once N.N. was in the longer-term foster placement, the foster parents immediately addressed the dental issue, and N.N. needed dental surgery on half of her teeth. Mother believes that although Father has said he wanted to adopt her sons, he took steps to abandon them around the time this suit began.

By contrast and in Father's favor, witnesses testified that Father indeed did most of the household work and was constantly involved in parenting the children, including preparing them for school or for bed and helping make meals. When the children were placed with one of

12

their grandmothers and not with Father and Mother, Father would often come to the home to help with tasks, and the children seemed to love him. The conservatorship caseworker called Father the "more structured parent." The guardian ad litem saw the children happy during her visits during the return-and-monitors. Father completed a batterers'-intervention program, for which the lead counselor commended Father for his participation; participated in individual therapy and group therapy with Mother and S.L.; and was successfully discharged by his therapist after, the therapist confirmed, working hard in that program, being honest, and taking accountability. The psychological evaluator noted several strengths in Father, including compliance, forthrightness, and taking accountability, and believed that he has a strong prognosis for staying sober. Father said that he had been similarly involved in raising the younger of his now-adult daughters. Father maintained employment and a home. At least some of N.N.'s negative behaviors were attributed to being separated from her parents. Father testified that his grown daughters' testimony is not credible—that T.N. was lying and that C.E. is the "evil sister."

To sum up under the second, third, seventh, eighth, and ninth *Holley* factors, the evidence overwhelmingly pointed to termination. Father has abused drugs for years and relapsed in a significant way during this suit, when his parental rights were on the line. He failed to provide N.N. a safe and stable home life during the return-and-monitors. And he has driven away many of the people who were closest to him. Some of this evidence was rebutted, to be sure, but the evidence under these factors points overwhelmingly to termination.

Under the fourth, fifth, and sixth factors, the evidence showed that all the children living with Father and Mother grew dysregulated and erratic under their care and that the children universally improved after time at the longer-term foster placement. The children are happy at the foster placement and no longer have night terrors or emotional difficulties. And the foster parents

have found the children a therapist, provide them their medications, invite T.N. to participate, and are bonded with them. The therapist does not recommend that the children undergo joint therapy with Father and Mother. In one troubling instance shortly before trial, Father, Mother, and Mother's mother jointly called S.L.'s mother and berated her and told her that they will work to keep her from ever seeing the children again. Half-siblings K.L. and E.L. are resentful toward Father and Mother because the parents have asked them to lie to the Department. Father and Mother's discussing this suit with the children violated the Department's directions.

Some evidence was favorable to Father under these factors, including what we have already summarized. Additionally, testimony suggested that adoption is not a sure-fire route to permanence for children and that the Department—through offering services and acting as a mediating agent—can help rebuild the relationship between a child and his or her parent.

But in all, under all the *Holley* factors, the evidence against Father's position overwhelmed the modicum of evidence in his favor. We hold that the evidence was factually insufficient for the trial court to have found against the Department on "best interest" regarding Father. Accordingly, we sustain this portion of the first appellate issue.

### *Best interest concerning Mother*

Similarly for Mother, we conclude that the evidence was legally sufficient but factually insufficient for the trial court to have found against the Department's position on "best interest." Much of the evidence we have detailed above applies with equal force to Mother, for example, evidence about the home life that both Mother and Father created for the children. What follows is our review of the evidence for and against Mother using the *Holley* factors.

14

The first factor points in favor of termination for the same reasons as that factor pointed in favor of terminating Father's rights.

The evidence under the second, third, seventh, eighth, and ninth *Holley* factors, although somewhat rebutted, overwhelmingly points to termination. Within the evidence, Mother's drug abuse was a major topic, and both her conduct in the home and other aspects of her behavior were relevant as well.

Regarding the drug abuse, *see J.C.*, 2023 WL 2169492, at *6, Mother, by her own admission and according to testimony from her sister and corroboration by the psychologist who evaluated her, has abused drugs for many years and is addicted. Her drugs of frequent choice include heroin and methamphetamine. She has also abused Xanax and used amphetamine and cocaine sporadically. During an earlier Department suit in 2013 and 2014, Mother participated in drug-court proceedings but was held in contempt by the drug court and ultimately unsuccessfully discharged from its proceedings.

Mother's drug abuse also led to this suit—the incident when the children were alone in the car—and continued to crop up throughout it. When the Department set up the two return-and-monitors, it was expressing hopeful agreement with Mother that she was ready to care for the children. But both failed after Mother tested positive for illegal drugs. She even used illegal drugs at least once in the home with the children after the first return-and-monitor had failed. And other testimony showed that Mother has kept drug paraphernalia in the home even though E.L. "goes through everything," like the cabinets. Testimony was conflicting about how long Mother has been able to stay sober over time. Then after the second return-and-monitor failed, Mother started refusing to take drug tests. There was also conflicting evidence about video exhibits admitted—one video depicts Mother outside Department offices just before a scheduled visitation

15

appearing intoxicated. Mother testified that the video actually showed the combined effects of methadone, which she said she takes to combat her addiction, and lack of sleep. Further, Mother's drug abuse has affected those around her. One of Father's friends testified that it will be easier for Father to stay sober once he and Mother separate. Plus, the testimony by the psychologist explained how this drug abuse can affect the children—the problems with self-esteem and self-confidence, forming relationships, and developing mental-health problems. The children's therapist is treating them for emotional dysregulation and trauma, and the children have expressed that their home life with Mother was chaotic and unsafe.

Some of the evidence about Mother's drug use was rebutted. Her OSAR counselor recommended merely that she undergo detoxification during one relapse during this suit. And both before and during the suit, Mother has successfully completed numerous drug-treatment programs. These efforts have helped her to maintain some long periods of sobriety, including, according to her, one four-and-a-half year period that comprised only one relapse. Facts like these led Father, who otherwise offered testimony contrary to Mother's position and whom Mother testified she would soon divorce, to testify that Mother can stay sober long-term. The psychologist expressed general agreement, testifying that he believes that in situations like Mother's, that is, successfully undergoing inpatient treatment more than once, the individual has a higher probability of remaining sober long-term. Other testimony suggested that individuals with unsuccessfully treated PTSD and trauma can have a more difficult time staying sober, and testimony by Mother and the psychologist suggested that those factors were present in Mother. Mother reported that she stays current on her psychiatric medications, which are helping her. During the suit, Mother provided numerous negative drug-test results, and the two return-and-monitors stemmed from the Department's belief that Mother was and could stay sober.

16

Second among the relevant topics under these *Holley* factors was Mother's other conduct in the home. *See D.W.*, 2022 WL 91972, at *8; *E.N.*, 2021 WL 2460625, at *8; *E.M.*, 494S.W.3d at 226. The guardian ad litem testified that during the second return-and-monitor, she learned that the children were going without their mental-health medication as often as prescribed, and the children were experiencing drop-offs in their own behavior at the same time. This was also when the home was found to be horribly messy, with animal feces on children's bedding, cigarette butts on the floor, and their noticeable stench. The home sometimes lacked electricity, so others had to give Mother and Father money to pay bills. During the earlier placement with S.L.'s mother, Mother and Father stayed in the home even though the Department had instructed them not to because they had nowhere else to stay. The Department also took the unusual step of requiring Mother and Father to provide adequate food to the children and not to physically punish them because the children themselves had complained about those items. Also, as mentioned above, the children believed home life with Mother to be chaotic.

By contrast and in Mother's favor, she and others testified that she is an attentive parent. Testimony showed that she has planned birthday parties and other fun activities for the children, with lots of people attending. Mother completed Department-required services, including those designed to address parenting in the home, although she was once dismissed by a therapist for failing to keep appointments. The guardian ad litem observed other times when the children were happy in the home with Mother. And the psychologist offered that Mother lacks traits that are common to child abusers.

Third, there was evidence of misbehavior by Mother outside the home. Mother admitted to a gambling problem during two of the three years before trial. She admitted that she cannot remember months-long stretches of 2021. She has verbally abused S.L.'s mother. Mother

17

once told her, seemingly threateningly, that there are no grandparents' rights in Texas. Mother has also had an outburst directed at a Department investigator during a removal. Mother has ceased communicating with the guardian ad litem. One of Father's adult daughters described Mother as emotionally manipulative, getting people to lie for her. She once had K.L. lie to Department personnel about S.L.'s being in the home. The psychologist too described Mother as having a "self-dramatizing style of pursuing praise in a manipulative, solicitous, or showy manner." The psychologist added that Mother is at "very high risk for experiencing chronic mental health and physical health problems" with little potential for that to change; has a "high probability of having a substance use disorder as well as a high probability of prescription drug abuse"; and gave impressions of major depressive disorder, generalized anxiety disorder, and PTSD. Shortly before trial, Mother, Mother's mother, and Father jointly made the phone call to S.L.'s mother to berate her. Mother missed six visitations. She once texted the conservatorship caseworker and told her to "consider moving to the Bahamas because, after this case is over, [the caseworker] will not want to see Texas again." She has also told the caseworker that she looked increasingly "dark and soulless." Mother breached her Safety Plan by discussing the suit with the children.

To sum up under the second, third, seventh, eighth, and ninth *Holley* factors, the evidence overwhelmingly pointed to termination. Mother has had years-long drug-abuse problems and has continued using drugs at least off-and-on during this suit. She failed to provide the children a safe and stable home life during the return-and-monitors. And she has exhibited varying misbehaviors otherwise. Some of this evidence was rebutted, to be sure, but the evidence under these factors still points overwhelmingly to termination.

Under the fourth, fifth, and sixth factors, evidence showed that Mother's ability to parent was hampered by a relationship with Father in which they cohabited but together caused

18

strife, was lacking because of how the children were sometimes treated, and was outshone by how the foster parents have improved the children's outcomes. Mother admitted that her relationship with Father was beset by codependency. The guardian ad litem knew their relationship to be turbulent, and the conservatorship caseworker saw Mother "violently yell" at Father during one visitation. This suit began not long after Father was jailed for domestic violence against Mother, but both sides of the relationship had clashed for some time. They had sometimes been heard by K.L. and E.L. "cussing and yelling." One of Father's adult daughters has heard Mother verbally abuse Husband. The other adult daughter thought that N.N. was unsafe with Mother and testified in an effort to protect N.N. Mother also has verbally abused K.L., making him cry. The children's therapist recommended against any joint therapy with Mother and Father. By contrast, the evidence was undisputed that the foster parents have provided the children with emotional support and guidance and have arranged for their treatment by mental-health professionals. Several witnesses noted how the children's behavior deteriorated when with Mother but then improved after returning to the foster parents' care. T.N. has become a staple in the children's lives under the foster parents' care. The foster parents want to adopt all three children. *See J.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00621-CV, 2023 WL 2334980, at *14 (Tex. App.— Austin Mar. 3, 2023, no pet. h.) (mem. op.) (best-interest analysis may involve "whether termination and adoption versus an impermanent foster-care arrangement would better serve the child's best interest").

On the other hand, there was evidence that Mother has been an attentive parent and has a support system in place among family and friends to help her care for the children. One among the support system, however, Mother's mother, abruptly left town even though she was at the time the children's placement, causing the Department to have to rush to find a temporary

19

caregiver. The grandmother explained that she left due to an acute health problem that has since subsided. Mother also completed many of the Department-directed services and actively participated in numerous appropriate visitations.

When we take all the evidence together under the guidance of the *Holley* factors, we conclude that the trial court's finding against the Department under "best interest" for terminating Mother's rights was against the overwhelming weight of the evidence and clearly wrong. We therefore sustain this portion of the first appellate issue.

As for the second appellate issue, the appellant's brief takes the position that we should not reach it if we sustain the first issue: "If this Court reverses the decision of the trial court finding that the Department lacked evidence to prove that termination was in the children's best interests, then this section is moot." We agree that we do not need to address the issue of possessory conservatorship regarding the parents. On remand for the new trial on "best interest" for termination, if Mother's and Father's parental rights are terminated, then they will not become the children's possessory conservators. If their rights are not terminated, then the trial court on remand will need to make an order of conservatorship and possession that is in N.N.'s best interest. *See* Tex. Fam. Code § 153.002.

## CONCLUSION

We hold that the evidence was legally sufficient but factually insufficient for the trial court to have failed to find that termination of Father's and Mother's parental rights was in N.N.'s best interest, i.e., the trial court's failure to form a firm conviction or belief that Father's and Mother's parental rights should be terminated is contrary to the overwhelming weight of the evidence and clearly wrong. We therefore reverse the trial court's Order in Suit Affecting the

Parent-Child Relationship, dated October 21, 2022, and remand for a new trial solely on the issue of "best interest" as to N.N.'s Mother and Father and on such other issues as may be necessary, consistent with this opinion. The trial on remand must begin no later than 180 days after we issue our mandate. *See* Tex. R. App. P. 28.4(c).

_____

J. Woodfin Jones, Justice

Before Justices Baker, Smith, and Jones[*]

Reversed and Remanded in Part

Filed:   June 7, 2023

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).